UNITED STATES of America,

v.

**Bernard Lazar HOFFMAN, a.k.a. Tony Alamo, Defendant.**

No. 93–20103.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 1, 1996.

---

---

Susan G. James, Law Office of Susan G. James, Montgomery, AL, for Plaintiff.

Devon L. Gosnell, McKnight, Hudson, Lewis & Henderson, Memphis, TN, J. Christopher Belcher, U.S. Department of Justice, Tax Division, Southern Criminal Enforcement Section, Jeffrey F. Kupfer, Andrew Plepler, Washington, DC, for Defendant.

## ORDER ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL

McCALLA, District Judge.

### I. *Introduction*

On April 19, 1993, defendant was indicted for one count of filing a false income tax return in violation of 26 U.S.C. § 7206(1) and three counts of failing to file an income tax return in violation of 26 U.S.C. § 7203.[1] After a three week trial, on June 8, 1994, the jury returned a guilty verdict as to all counts. On September 16, 1994, defendant was given a sentence of seventy-two months in prison and a $210,000.00 fine.

On July 11, 1994, defendant filed a motion for a new trial and/or judgment of acquittal based on ineffective assistance of counsel and the running of the statute of limitations for 26 U.S.C. § 7206(1). Defendant has supplemented his motion, and defendant and the United States have briefed the legal issues extensively. On July 14, 1995, the Court held a hearing on the ineffective assistance of counsel ground. After considering all of defendant's arguments, and for the reasons set out herein, defendant's motion is hereby DENIED.

### II. *Facts*

Defendant, the central figure behind Music Square Church, Inc., and related businesses, has been a defendant in state and federal court proceedings on several occasions.[2] In this case, defendant was charged with filing a false income tax return on August 15, 1986, in violation of 26 U.S.C. § 7206(1) and failing to file income tax returns for calendar years 1986, 1987, and 1988, in violation of 26 U.S.C. § 7203. Starting with the April 30, 1993, hearing on defendant's motion for bail review, this case was litigated aggressively by both the United States and the defendant. At that hearing—which was prior to defendant's May 13, 1993, initial appearance and entry of a not guilty plea as to all counts—the Court directed that motions regarding the appearance of Jeffrey Dickstein as counsel for the defendant be made within fourteen days. On May 14, 1993, the United States moved to disqualify Dickstein based on Dickstein's prior "display[s of] contempt for this country's well-established tax laws" and the potential conflict of Dickstein's previous representation of a prospective witness against defendant. Government's Motion to Disqualify Defense Counsel, May 14, 1993, at 1. On June 4, 1993, defendant moved for the admission of Dickstein pro hac vice and filed an opposition to the United States' motion to disqualify. On June 28, 1993, the Court held a hearing on the motion to disqualify. On August 31, 1993, the Court denied the motion to disqualify and granted the motion for Dickstein to be admitted pro hac vice.[3]

On June 14, 1993, defendant moved to dismiss the counts for filing a false return in 1986 (count one) and failing to file a return for the 1986 calendar year (count two) based on the alleged running of the six year statutes of limitation. On September 20, 1993, the Court referred the motion to Magistrate Judge Brown for report and recommendation. After an October 25, 1993, hearing,

---

**1.** This indictment superseded the three count information filed on April 13, 1993.

**2.** For example, defendant was an appellant in *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1988). *See infra* note 33 and accompanying text. Defendant was also a criminal defendant in *United States v. Alamo*, No. 91–20008 (W.D.Ark. 1991). Additionally, defendant was the bankrupt in *In re Alamo*, No. 92–418 (W.D.Ark.1992), and has been a party in various state domestic and civil matters.

**3.** Prior to the Court's ruling, defendant and the United States submitted numerous filings on these issues. On June 11, 1993, defendant filed a supplement to his motion for pro hac vice admission. On July 6, 1993, defendant filed a second supplement to his motion. On July 8, 1993, the United States filed a response to the supplements. On July 14, 1993, the United States filed an amendment to its motion to disqualify Dickstein. On July 16, 1993, defendant filed a motion to disqualify two attorneys for the United States based on their "unethically and maliciously attacking Defendant's attorney." Defendant also filed a reply to the United States' response to the supplements to defendant's motion for pro hac vice admission for Dickstein. On July 26, 1993, defendant filed a response to the United States' amended motion to disqualify Dickstein. On July 30, 1993, the United States filed a response to defendant's motion to disqualify counsel for the United States.

Magistrate Judge Brown issued his report and recommendation on October 28, 1993. Magistrate Judge Brown recommended that the motion be granted as to count one but not as to count two.[4] The United States filed an objection to the report and recommendation, and defendant filed a response to the objection. On December 1, 1993, the Court partially adopted and partially modified the report and recommendation, denying the defendant's motion as to both counts. The Court determined that 18 U.S.C. § 3290[5] tolled the running of the statute of limitation while defendant was fleeing from child abuse charges in California from October 7, 1989, until July 5, 1991.

On January 12, 1994, the United States filed a motion for a hearing to record defendant's waiver of the right to conflict-free representation. In this motion, the United States set out and discussed four potential conflicts of interest in Dickstein's representation of defendant: 1) the "potential conflict between Mr. Dickstein's duty towards Mr. Alamo and his duty towards likely trial witness Sanford White," 2) the "potential conflict due to Mr. Dickstein's possible prosecution for failure to file timely tax returns for 1991 and 1992 and for failure to file a currency transaction report that he was obligated to file in 1991," 3) the "potential conflict due to the possibility that Mr. Alamo and Mr. Dickstein may both be subject to prosecution for conspiracy to commit bankruptcy fraud," and 4) the "potential conflict between Mr. Dickstein's self-interest in retaining his law license and his obligation to represent Mr.

Alamo zealously." Government's Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation, January 12, 1994, at 1–5. The motion argued that a hearing to record the knowing and intelligent waiver of the right to conflict-free representation was necessary. On January 24, 1994, defendant filed an opposition to the motion in which he discussed and argued against each of the asserted conflicts, concluding that a waiver hearing was unnecessary since the suggested conflicts did not exist.[6] Defendant and Dickstein's Opposition to Government's Motion to Record Defendant's Waiver of Right to Conflict–Free Representation, January 24, 1994. On January 28, 1994, the United States filed a reply to defendant's opposition, stressing the distinction between potential and actual conflicts and the need to obtain a waiver on the record even if a conflict has not yet actualized. Government's Response to Defendant's Opposition to Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation, January 28, 1994, at 2.

On February 23, 1994, the Court held a telephone hearing on the waiver issue.[7] At this hearing, the Court, Dickstein, and United States Attorney Belcher discussed the four potential conflicts set out in the United States' motion, the right of a criminal defendant to be represented by conflict-free counsel, and the requirements for and implications of a waiver of that right. Defendant indicated that he had "heard things" about Dickstein's potential conflicts of interest.

---

**4.** Count two of the indictment was repeated from the information filed on April 13, 1993—within the six year statute of limitations that began to run on April 15, 1987. Accordingly, Magistrate Judge Brown's recommendation that count two should not be dismissed was not objected to and the Court adopted this portion of the report and recommendation with minimal discussion.

**5.** Eighteen U.S.C. § 3290 provides that "[n]o statute of limitations shall extend to any person fleeing from justice."

**6.** As to the first potential conflict, defendant denied that Dickstein ever represented Sanford White. Defendant and Dickstein's Opposition to Government's Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation, January 24, 1994, at 2. As to the

second potential conflict, defendant stated that "Dickstein has settled with the IRS, through the United States Tax Court, and has filed all tax returns and currency transaction reports." *Id.* As to the third potential conflict, defendant stated that defendant and Dickstein did not engage in conduct constituting conspiracy to commit bankruptcy fraud. *Id.* at 3–4. As to the fourth potential conflict, defendant argued that Dickstein had represented and would continue to represent defendant zealously. *Id.* at 4–5.

**7.** The Court scheduled a telephone hearing at least in part for the convenience of the defendant. Tr., Hr'g, February 23, 1994, at 10. Although the Court could not observe defendant visually during the hearing, defendant's statements revealed that he could hear what was being said.

Tr., Hr'g, February 23, 1994, at 3–4. In response to the Court's question of whether defendant wanted the Court "to throw Mr. Dickstein out as counsel in this case," defendant answered, "No, I don't." Tr., Hr'g, February 23, 1994, at 5–6. Although defendant had indicated that "I don't want to waive any of my rights," Tr., Hr'g, February 23, 1994, at 5, after the implications ,of a waiver of the right to conflict-free counsel were explained at length, defendant engaged in the following exchange with Dickstein:

> Mr. Dickstein: Tony, did you receive the copies of the motions from me that the government sent regarding conflict of interest?
>
> Mr. Alamo: You want me to answer that?
>
> Mr. Dickstein: Yes.
>
> Mr. Alamo: Yes, I did.
>
> Mr. Dickstein: Did you read them?
>
> Mr. Alamo: Yes.
>
> Mr. Dickstein: Did we discuss those?
>
> Mr. Alamo: Yes.
>
> Mr. Dickstein: You still want me as your attorney?
>
> Mr. Alamo: Yes.

Tr., Hr'g, February 23, 1994, at 18. After this exchange, the Court stated that "I think that does satisfy the situation here." Tr., Hr'g, February 23, 1994, at 19.

The trial began on May 16, 1994, producing over three thousand pages of transcript; the United States put on thirty-three witnesses and introduced 227 exhibits, and defendant put on twelve witnesses and introduced ninety-nine exhibits. The jury began deliberations on June 6, 1994, and returned a guilty verdict as to all counts on June 8, 1994. On July 8, 1994, defendant moved for the withdrawal of Dickstein as his counsel, and, on July 11, 1994, moved to substitute his current counsel, Susan James. On August 9, 1994, the Court granted both motions. On July 11, 1994, defendant filed a motion for a new trial and/or judgment of acquittal on the basis of ineffective assistance of counsel and the operation of the statute of limitations as to count one. Defendant's Motion and Mem-

orandum of Law in Support of Motion for Judgment of Acquittal and/or New Trial, July 11, 1994 [hereinafter, Motion for New Trial]. Defendant also moved for leave to supplement his motion.[8] On July 25, 1994, the United States filed a response to defendant's motion. Government's Response to Defendant's Motion for Judgment of Acquittal and/or New Trial, July 25, 1994. On August 11, 1994, defendant filed a reply to the United States' response to his motion. Defendant's Response to Government's Response to Defendant's Motion for Judgment of Acquittal and/or New Trial, August 11, 1994 [hereinafter, Defendant's Reply to Government's Response to Motion for New Trial]. On October 21, 1995, the Court granted defendant's October 14, 1994, motion for the Court to abstain from ruling on defendant's motion until defendant could supplement his motion after the completion of the trial transcript. On December 16, 1994, the Court permitted defendant until February 1, 1995, to. supplement his motion. On February 3, 1995, defendant filed a supplemented motion. Supplemental Motion and Memorandum of Law in· Support of Defendant's Motion for Judgment of Acquittal and/or New Trial, February 3, 1995 [hereinafter, Supplemental Motion for New Trial]. On March 20, 1995, the United States filed a response to the supplemented motion. Government's Response to Defendant's Supplemental Motion and Memorandum of Law in Support of Defendant's Motion for Judgment of Acquittal and/or New· Trial, March 20, 1995 [hereinafter, Government's Response to Supplemental Motion for New Trial]. On April 18, 1995, defendant filed a reply to the United States' response. Defendant's Response to Government's Response· to Defendant's Supplemental Motion and Memorandum of Law. in Support of Defendant's Motion for Judgment of Acquittal and/or New Trial, April 18, 1995 [hereinafter, Defendant's Reply to Government's Response to Supplemental Motion for New Trial]. On July 14, 1995, the Court held an evidentiary hearing on defendant's motion for a new trial based on the claim of ineffective assistance of counsel.[9] Both defendant

---

8. On August 9, 1994, the Court granted defendant leave to supplement his motion.

9. Defendant requested the hearing in a February 16, 1995, motion.

and Dickstein testified at the hearing. Defendant and the United States filed post-hearing briefs on July 26, 1995, and August 4, 1995, respectively. Defendant's Letter Brief, July 26, 1995; United States' Post-Hearing Memorandum, August 4, 1995.

## III. Discussion

### A. Motion for Judgment of Acquittal

#### 1. Federal Rule of Criminal Procedure 29(c)

█ Under Fed.R.Crim.P. 29(c), a motion for judgment of acquittal must be made within seven days after the discharge of the jury unless the court extends the time for making such a motion. In this case, the jury was discharged on June 8, 1994, and the defendant filed his motion on July 11, 1994. The court did not grant defendant permission to file a motion under Fed.R.Crim.P. 29(c) after the expiration of the specified time limit. Therefore, defendant's motion is not timely and can not give rise to relief.

█ Even if defendant's motion could be considered on its merits, the motion would have to be denied. A motion for judgment of acquittal should be granted if the "evidence is insufficient to sustain a conviction." Fed. R.Crim.P. 29(a). Defendant contends that he argued insufficient evidence "at trial and maintains this post trial [sic]." Defendant's Reply to Government's Response to Motion for New Trial, at 9. In fact, defendant makes no argument why the evidence as to any or all counts was insufficient to sustain a conviction. A review of the record of this case indicates that there was more than sufficient evidence for the jury to conclude, as it

did, that defendant was guilty of the crimes charged.

#### 2. Statute of Limitations

█ Defendant does not identify the context for consideration of his argument that the statute of limitations should have barred his conviction as to count one—filing a false income tax return on August 15, 1986, in violation of 26 U.S.C. § 7206(1). In that the argument seeks an acquittal as to that count rather than retrial, the motion may be considered as a motion for judgment of acquittal under Fed.R.Crim.P. 29(c).[10] Essentially, however, defendant is asking the Court "to reconsider its decision in overruling the Magistrate Judge's recommendation to dismiss Count One of the indictment." Motion for New Trial, at 25. Defendant offers no new argument on this issue,[11] and the Court finds no reason to revisit its decision of December 1, 1993, that count one of the indictment should not be dismissed.

### B. Motion for New Trial

#### 1. Federal Rule of Criminal Procedure 33

Under Fed.R.Crim.P. 33, a motion for a new trial must be made within seven days of the verdict or such further time as the court directs, unless the motion is based on the ground of newly discovered evidence—in which case the motion must be made within two years of the final judgment. In this case, the jury rendered a verdict on June 8, 1994, and the defendant filed his motion on July 11, 1994. The Court did not permit defendant to file his motion after the expiration of the seven day period.[12] Accordingly, defendant's motion is only timely if it is

---

**10.** As discussed *supra* part III.A.1, the motion for judgment of acquittal under Fed.R.Crim.P. 29 was not timely and can not be considered on its merits.

**11.** Defendant, while acknowledging that the controlling law dictates that 18 U.S.C. § 3290 tolls federal statutes of limitations where a defendant is fleeing state criminal charges, argues that defendant has "exigent circumstances" not contemplated by statute or caselaw. Motion for New Trial, at 23. Defendant argues that 18 U.S.C. § 3290 applies only to defendants in flight at the time that the applicable statute of limitations runs, and that, since defendant was arrested for the California child abuse charges before the

statute on filing a false return had run, 18 U.S.C. § 3290 does not apply to defendant. This is clearly not a correct interpretation of the statute and caselaw.

**12.** Under Fed.R.Crim.P. 33, an extension in which to file a motion for a new trial must be granted within the seven day period following the verdict. The Court's August 9, 1994, order granting leave to supplement can not be considered such an extension since it was granted after the seven day period and specified that supplemental filings would relate back to the July 11, 1994, motion, which was itself untimely.

based on the ground of newly discovered evidence.

### a. *Newly Discovered Evidence*

■■■■ Motions for a new trial based on newly discovered evidence should be granted with caution. *United States v. Seago,* 930 F.2d 482, 488 (6th Cir.1991) (citing *United States v. O'Dell,* 805 F.2d 637, 640 (6th Cir. 1986) ("Motions for a new trial are disfavored . . . ."), *cert. denied,* 484 U.S. 859, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987)). Defendant bears the burden of showing that: 1) the new evidence was discovered after the trial, 2) the evidence could not have been discovered earlier with due diligence, 3) the evidence is material and not merely cumulative or impeaching, and 4) the evidence would likely produce acquittal. *Id.* Evidence of ineffective assistance of counsel is not newly discovered evidence for the purpose of a motion for new trial where the facts supporting the claim were within the defendant's knowledge at the time of trial. *Id.* at 489; *see also United States v. Lema,* 909 F.2d 561, 565 (1st Cir.1990); *United States v. Miller,* 869 F.2d 1418, 1421–22 (10th Cir.1989); *United States v. Ugalde,* 861 F.2d 802, 806–07 (5th Cir. 1988), *cert. denied,* 490 U.S. 1097, 109 S.Ct. 2447, 104 L.Ed.2d 1002 (1989); *United States v. Dukes,* 727 F.2d 34, 38 (2d Cir.1984); *United States v. Lara–Hernandez,* 588 F.2d 272, 275 (9th Cir.1978); *United States v. Ellison,* 557 F.2d 128, 133 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977). Tactical errors committed in the course of trial are facts within the defendant's knowledge at the time of trial. *See Seago,* 930 F.2d at 489. The defendant's failure to appreciate the legal significance of an error until after trial does not constitute newly discovered evidence. *See id.* (citing *Ugalde,* 861 F.2d at 806).

■■■■ Defendant fails to satisfy the four elements set out in *United States v. O'Dell,* 805 F.2d 637, 640 (6th Cir.1986). First, no new evidence was discovered after trial. Defendant was aware of his counsel's conduct leading up to and during trial, and was aware of the conflict allegations from the filings that he acknowledges having read and by his presence at the June 28, 1993, and February 23, 1994, hearings.[13] Defendant claims that he did not grasp the "extent and ramifications" of Dickstein's alleged conflicts until after trial. Motion for New Trial, at 3. This does not amount to new evidence. Second, even if defendant's contention that he discovered filings after the trial that gave him enough information to grasp the "extent and implications" of Dickstein's alleged conflicts is accepted, *see* Motion for New Trial, at 10–11, it is clear that due diligence on the part of defendant would have discovered such filings prior to trial.[14] At a minimum, due diligence by a criminal defendant entails reading the filings in one's own case. Third, the "evidence" that defendant claims to have discovered after trial is not material in that it does not relate to an element of or defense to the charged offenses. Ineffective assistance of counsel is not properly considered a "defense" to 26 U.S.C. § 7203 or 26 U.S.C. § 7206(1). Finally, evidence of ineffective assistance of counsel is not likely to produce acquittal. If a defendant's Sixth Amendment right to effective assistance of counsel has been violated, then the proper remedy is retrial not acquittal. Since defendant's motion is not based on the ground of newly discovered evidence, it is not timely and can not give rise to relief. Assuming that defendant had filed a timely motion for a new trial, his motion would still have to be denied on its merits because defendant waived his right to conflict-free representation and there was no ineffective assistance of counsel in this case.

### 2. *Waiver of the Right to Conflict–Free Representation*

■■■■ The Sixth Amendment guarantees a criminal defendant the right to effec-

---

13. *See* discussion *infra* part III.B.2.

14. At the February 23, 1994, hearing, defendant answered affirmatively in response to Dickstein's question about whether defendant had received "motions" filed by the United States about the conflict of interests issue. Tr., Hr'g, February 23, 1994, at 18. This runs contrary to defen-

dant's post-trial contention that the only pleading from the United States he received on this issue prior to trial was the Government's Motion for Hearing to Record Defendant's Waiver of the Right to Conflict–Free Representation. Motion for New Trial, at 11.

tive assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). An actual conflict of interest that adversely affects counsel's performance will deprive a defendant of this right. *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). However, a criminal defendant can waive his Sixth Amendment rights. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). When a trial court "becomes aware of a potential conflict of interest, it is obligated to pursue the matter even if counsel does not." *United States v. Krebs,* 788 F.2d 1166, 1172 (6th Cir.1986) (citing *United States v. Taylor,* 657 F.2d 92, 94 (6th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981)). Waiver of the right to conflict-free counsel must be voluntary and "constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case including the background, experience, and conduct of the accused.'" *Edwards,* 451 U.S. at 482, 101 S.Ct. at 1884 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). In *Krebs,* the Sixth Circuit found a constitutionally valid waiver where defendant filed an affidavit stating that he "waive[d] any conceivable—actual or potential—conflict," and answered in the affirmative to the court's inquiries in a waiver hearing of whether he was aware of the "right to be represented by fully effective and fully loyal and conflict free counsel" and whether he

wished to retain his counsel despite potential conflicts of interest. 788 F.2d at 1168–73.

■ In this case, defendant waived his right to conflict-free counsel at the February 23, 1994, hearing. Even assuming that defendant was unaware of the contents of any of the filings relating to Dickstein's potential conflicts of interests other than the Government's Motion to Record Defendant's Waiver of Right to Conflict–Free Representation and Defendant and Dickstein's Opposition to Government's Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation, the Court still finds that defendant had enough information to execute a voluntary, knowing, and intelligent waiver. *See Edwards,* 451 U.S. at 482, 101 S.Ct. at 1883–84; *Krebs,* 788 F.2d at 1173. Defendant ran a large organization and had experience as a criminal defendant. *See Krebs,* 788 F.2d at 1172–73 (noting that defendant's experiences revealed that he "possessed sufficient intelligence to comprehend the import of a waiver" of the right to conflict-free representation). Defendant had employed many attorneys in the past and had particular confidence in the ability of Dickstein.[15] In selecting Dickstein as his counsel in this case, defendant was exercising his Sixth Amendment to retain counsel of his choice.[16] *See, e.g., Linton v. Perini,* 656 F.2d 207, 208–09 (6th Cir.1981).

■ At the June 28, 1993, disqualification hearing, defendant heard Belcher, Dickstein, and the Court discuss potential conflicts of interest in Dickstein's representation of defendant.[17] Specifically, Belcher noted that

15. Dickstein represented defendant in the 1991 trial that ended in acquittal on charges of threatening to kidnap United States District Judge Morris Sheppard Arnold in retaliation for ruling against defendant in a civil case. Motion for New Trial, at 2; *see United States v. Alamo,* No. 91–20008 (W.D.Ark.1991). Accordingly, defendant "had no reservations about Mr. Dickstein's competence or legal prowess as he was a proven winner." Motion for New Trial, at 2–3; Supplemental Motion for New Trial, at 4.

16. Courts have competing concerns in the context of potential conflicts of interest for retained counsel. On the one hand, the right to conflict-free representation requires courts to investigate potential conflicts of interest and determine if a defendant has sufficient information to decide to

waive this right and continue with potentially conflicted counsel. On the other hand, the right to retain counsel of one's choice dictates that a court does not have a free hand to remove retained counsel when the defendant expresses a desire that potentially conflicted counsel should continue. It is not the place of the court to substitute its own judgment that it is unwise to continue to retain counsel in the presence of a conflict of interest. Once the defendant has expressed the desire to keep his counsel despite a conflict of interest, the court can not attempt to change the defendant's mind.

17. Defendant contends that he never read the filings prior to the disqualification hearing. *See* Motion for New Trial, at 11. However, defendant was aware of the potential conflict relating

Dickstein had been referred to the California bar for disciplinary proceedings. Tr., Hr'g, June 28, 1993, at 22–23. Additionally, Belcher stated that Dickstein's statement that he had not filed a tax return since 1983 invited criminal prosecution, at which defendant could be called as a witness against Dickstein. Tr., Hr'g, June 28, 1993, at 23, 31, 52. Belcher also noted that Dickstein was currently engaged in civil proceedings with the Internal Revenue Service regarding his failure to file. Tr., Hr'g, June 28, 1993, at 23. Lastly, Belcher related Dickstein's admissions to Judge Mixon of the United States Bankruptcy Court for the Western District of Arkansas that he had not filed currency reports after receiving cash payments from defendant and his associates. Tr., Hr'g, June 28, 1993, at 24; see In re Alamo, No. 92–418 (Bankr.W.D.Ark. Sept. 16, 1992) (transcript of in camera hearing).[18] Belcher stated that Judge Mixon had referred the matter to the United States Attorney's office for possible criminal prosecution.[19] Tr., Hr'g, June 28, 1993, at 24. Belcher explained that Dickstein could be subject to criminal prosecution for bankruptcy fraud, failure to file currency reports, and failure to file income tax returns including the cash payments as income. Tr., Hr'g, June 28, 1994, at 25. The filings in the month following the disqualification hearing, see supra note 3, repeated and discussed the information defendant heard at the hearing.

Defendant admits that he read the Government's Motion to Record Defendant's Waiver of Right to Conflict–Free Representation and Defendant and Dickstein's Opposition to Government's Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation prior to the February 23, 1994, waiver hearing. See Motion for New Trial, at 11. Not only do these filings discuss Dickstein's potential conflicts of interest, see supra note 6 and accompanying text, they also state that a criminal defendant may make a "knowing and intelligent waiver of his right to representation by conflict-free counsel." Government's Motion to Record Defendant's Waiver of Right to Conflict–Free Representation, January 12, 1994, at 7 (quoting Krebs, 788 F.2d at 1173). By the February 23, 1994, waiver hearing, defendant had nearly eight months to digest the information detailing Dickstein's potential conflicts of interest. The waiver hearing itself left no doubt that its purpose was to ascertain whether defendant was aware of Dickstein's potential conflicts and whether defendant desired to waive his right to an attorney without conflicts and continue to retain Dickstein as his counsel. Defendant executed a voluntary, knowing, and intelligent waiver of his right to conflict-free representation by his unambiguous responses. See Tr., Hr'g, February 23, 1994, at 18.

Defendant makes two general arguments against a finding of waiver: 1) that he lacked sufficient knowledge to execute a knowing and intelligent waiver, and 2) that the waiver hearing was somehow defective. Both arguments are not supported by fact or law. Defendant claims that he "did not know … the extent and ramifications of the obvious conflict of interest that existed in Mr. Dickstein's representation of him," Motion for New Trial, at 3; Supplemental Motion for New Trial, at 4, and that he did not "under-

---

to Stanford White, noted in the Government's Motion to Disqualify Defense Counsel, May 14, 1993, at 1, based on his personal experience. Defendant had instructed Dickstein to contact the Internal Revenue Service on behalf of White, an associate of defendant. Defendant and Dickstein's Opposition to Government Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation, January 24, 1994, at 1–2.

18. After determining that the transcript of in camera hearing with Judge Mixon was not sealed, the United States filed it with the Addendum to its Motion to Disqualify on July 13, 1993.

19. Belcher also stated that the Tax Division of the Department of Justice had received a request for a criminal investigation as to Dickstein's alleged failure to file tax returns. Tr., Hr'g, June 28, 1993, at 50.

Defendant claims he was not aware that Judge Mixon had referred Dickstein for investigation until after trial, and contends that this information would have changed defendant's mind about continuing with Dickstein. Defendant's Reply to Government's Response to Motion for New Trial, at 7. Clearly, defendant was aware of the referral and he can not avoid waiver by claiming ignorance in contravention of the record in this case.

stand[ ] and appreciat[e] the seriousness of the Governments [sic] conflict allegations against Dickstein." Defendant's Reply to Government's Response to Supplemental Motion for New Trial, at 5. As previously discussed, defendant was exposed to ample evidence of Dickstein's potential conflicts of interest. It is not credible that defendant did not grasp the "extent and ramifications" or the "seriousness" of Dickstein's potential conflicts of interest after two separate hearings and numerous filings.[20] Defendant's contention that he would have decided not to continue to retain Dickstein if he had understood the contents of the filings that he claims not have been aware of until after trial,[21] *see* Motion for New Trial, at 13, is self-serving and inconsistent with the record.

█ Defendant's other basic argument is that the February 23, 1994, waiver hearing failed to meet certain suggested procedural requirements. Defendant attempts to convince the Court that the law of the Sixth Circuit requires something different than what is set out is *United States v. Krebs*, 788 F.2d 1166, 1173 (6th Cir.1986) (holding that waiver must be voluntary, knowing, and intelligent on the facts and circumstances of each case). First, defendant incorrectly attributes a quotation from *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975), to *Johnson v. Zerbst*, 304 U.S. 458, 464, 58

S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), implying that the Supreme Court dictates that a valid waiver of the right to conflict-free representation can only result from the court informing the defendant of the dangers of the conflict, permitting the defendant to ask questions of the court, seeking a narrative response from the defendant to the effect that he understands the conflict and wishes to waive his right after consultation, and ensuring that the defendant uses unequivocal and unambiguous language in waiving his right. Supplemental Motion for New Trial, at 30–31. Despite defendant's representation, the quoted language from *Garcia* has never been adopted by the Supreme Court or by the Sixth Circuit Court of Appeals and is not controlling in the Court's inquiry. Second, defendant contends that the "Sixth Circuit has followed the *Zuck [v. Alabama*, 588 F.2d 436, 440 (5th Cir.1979),] test as relates to [sic] knowing and voluntary waivers of conflict[-]free counsel." Supplemental Motion for New Trial, at 32. This is not correct. *Zuck* has never been cited by a Sixth Circuit Court of Appeals case, and the only district court case in the Sixth Circuit to cite *Zuck*, *Dixson v. Quarles*, 627 F.Supp. 50, 53 (E.D.Mich.1985), does not adopt *Zuck*'s test for waiver.[22]

Defendant cites *United States v. Edwardo–Franco*, 885 F.2d 1002 (2d Cir.1989), for

**20.** Defendant claims that he had read only the Government's Motion to Record Defendant's Waiver of Right to Conflict–Free Representation and Defendant and Dickstein's Opposition to Government's Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation prior to the hearing. Motion for New Trial, at 11. However, the record clearly establishes that these two documents, along with the June 28, 1993, hearing and the February 23, 1994, hearing, provided defendant with the evidence that he now claims not to have seen until after trial. Further, all the information relating to Dickstein's potential conflicts was readily accessible to defendant, who had numerous associates involved in preparing his defense.

**21.** Defendant makes an additional argument based on not having access to information that has never been part of the record in this case. With respect to the potential prosecution of Dickstein for various tax crimes, defendant contends that he "had no benefit of the Internal Revenue Services [sic] file on Dickstein to know exactly the seriousness of Dicksteins [sic] problems with the IRS as relates to their attorney/client rela-

tionship." Defendant's Reply to Government's Response to Supplemental Motion for New Trial, at 6. This argument is spurious. Not only would such files generally be unavailable to a criminal defendant, but the information available to defendant in this case more than established the potential conflict brought on by the possibility of criminal prosecution of Dickstein.

**22.** The test set out is *Zuck* requires that a defendant waiving his right to conflict-free representation must have 1) been aware that a conflict of interest existed, 2) realized the consequences to his defense of his counsel's continuation, and 3) been aware that he could get other counsel. 588 F.2d at 440. Based on the information presented to defendant at the June 28, 1993, disqualification hearing, in the numerous filings relating to Dickstein's representation, and in the February 23, 1994, waiver hearing, defendant arguably had the requisite awareness of the conflict, consequences, and availability of other counsel to satisfy the *Zuck* test—were it to apply.

the proposition that an explicit waiver may be insufficient if the trial court has failed to apprise the defendant of the ramifications of the conflicts of interest and has not afforded the defendant time to decide whether to waive his right to conflict-free representation. Supplemental Motion for New Trial, at 29. At the February 23, 1994, hearing, however, the Court explained the ramification of the conflicts at length and the defendant had ample time to consider the issues. Further, the potential conflicts of interest in Dickstein's representation of defendant had been discussed at length at the June 28, 1993, disqualification hearing and in numerous filings thereafter. Thus, defendant had almost eight months to mull over his decision to retain Dickstein despite the presence of potential conflicts of interest, and defendant indicated unequivocally that he wanted Dickstein as his attorney.

■ Defendant next argues that his waiver at the February 23, 1994, waiver hearing was flawed in that defendant was not informed of his right to and afforded an opportunity to consult with outside counsel "for the limited purpose of making an informed decision as to his position on continuing with current counsel Dickstein or obtaining other counsel." Motion for New Trial, at 11–12; Supplemental Motion for New Trial, at 14. Defendant cites *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir.1986), for the proposition that a court must advise a criminal defendant of the right to consult independent counsel in making the determination whether to waive the right to conflict-free representation. However, *Iorizzo* has not been cited by any Sixth Circuit case, and the law in the Sixth Circuit is to the contrary. In *United States v. Krebs*, 788 F.2d 1166 (6th Cir.1986), the Sixth Circuit found a valid waiver even though the Court did not inform defendant of the right to consult outside counsel in making the decision whether to waive his right to

conflict-free representation. In this case, the fact that the Court did not specifically address defendant and tell him that he could seek outside counsel before making his decision does not affect the validity of the waiver.[23]

■ Defendant also contends that, because the February 23, 1994, hearing was conducted by telephone, the Court was unable to establish that defendant had understood the filings relating to conflict and waiver. Supplemental Motion for New Trial, at 12. Despite defendant's reluctance to speak at the hearing—which was a product of defendant's demeanor rather than his physical absence—defendant declared that he had received, read, and discussed the filings relating to conflict and waiver. Tr., Hr'g, February 23, 1994, at 18. Given all the facts and circumstances, this was enough.[24] Defendant argues that the Court did not satisfy the requirements of *United States v. Straughter*, 950 F.2d 1223 (6th Cir.1991), by going to "great pains" to ascertain a knowing waiver. Supplemental Motion for New Trial, at 30. However, *Straughter* does not require that a court go to "great pains," but simply characterizes the efforts of the district court in the case in establishing an unassailable waiver on the record. 950 F.2d at 1234. A review of the record in this case indicates that the Court fulfilled its obligations with respect to obtaining defendant's voluntary, knowing and intelligent waiver on the record.

### 3. *Ineffective Assistance of Counsel*

■ Even if defendant had not waived his right to conflict-free representation, he would be unable to demonstrate a violation of his Sixth Amendment rights. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *See McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). This does

---

**23.** The record indicates that defendant was aware of the option of seeking outside counsel and did not do such. Dickstein testified at the July 14, 1995, evidentiary hearing that he had apprised defendant of the right to consult independent counsel prior to the February 23, 1994, waiver hearing. Tr., Hr'g, July 14, 1995, at 51, 54.

Where, as here, the counsel's potential conflicts of interest should be obvious to the defendant, consultation with outside counsel is of limited use. *See, e.g., United States v. Lowry*, 971 F.2d 55, 62 (7th Cir.1992); *Williams v. Meachum*, 948 F.2d 863, 868 (2d Cir.1991).

**24.** *See supra* note 16.

not mean that nothing short of acquittal—in a sense, the most effective assistance of counsel—will satisfy the Sixth Amendment. Rather, assistance of counsel must be effective in that it ensures the "proper functioning of the adversarial process [such] that the trial [can] be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984). According to *Strickland,*

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

 Counsel's performance is only deficient if it falls below "an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. at 2064. Such a determination is made "considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The court determines whether acts or omissions of counsel alleged "not to have been the result of reasonable professional judgment" fall "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. Counsel's "strategic choices made after thorough investigation of law and facts relevant

to plausible options are virtually unchallengeable." *Id.*

 To establish that alleged deficiencies in defense counsel's performance prejudiced the defense,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. In the context of a challenge to a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068–69. This determination "must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like" and "should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695, 104 S.Ct. at 2068. However, there is a limited presumption of prejudice when "counsel is burdened by an actual conflict of interest." *Id.* at 692, 104 S.Ct. at 2067. "Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* at 692, 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)).

Defendant fails to make the requisite showing under *Strickland.* Defendant does not offer specific instances where Dickstein's acts or omissions rose to the level of deficient performance. Even if Dickstein's performance could be considered deficient, defendant does not show that such deficiency prejudiced the defense or that defendant is entitled to a presumption of prejudice based on an actual conflict of interest that adversely affected Dickstein's performance.

### a. *Deficient Performance and Prejudice to the Defense*

Defendant's Motion for New Trial offered only general allegations of Dickstein's defi-

cient performance, supported by no specific instances.[25] The Supplemental Motion for New Trial afforded defendant an opportunity to offer specific instances in support of his general allegations that Dickstein's performance was deficient. To the extent that defendant did offer specific instances, defendant fails to show that Dickstein's performance ever fell below "an objective standard of reasonableness." *See Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064–65. Further, given the evidence against defendant in this case, defendant's alleged deficiencies do not suggest that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068–69.

■■■ Defendant contends that "Dickstein failed to effectively cross[-]examine the majority of the Government witnesses." Supplemental Motion for New Trial, at 34. Although defendant claims to have had damaging information on certain witnesses—for example, former wives and employees of defendant—defendant was unable to use this information because Dickstein could not introduce the evidence in contravention of Fed.R.Evid. 608(b). *Id.* at 34–37. Instead, Dickstein's cross-examination, particularly of witnesses "who[m] Dickstein asked only a few questions or none at all," allowed the jury to believe the prosecution.[26] *Id.* at 37. Defendant contends that "[i]f Dickstein had grasped the tenants [sic] of Rule 608(b)[, then] the cross[-]examination may have then become meaningful and given the jury the reasonable doubt necessary for a finding of not guilty." *Id.* at 38. Essen-

tially, defendant faults Dickstein for not being able to get around Fed.R.Evid. 608(b) and use extrinsic evidence to attack the credibility of witnesses who testified against defendant. Dickstein can not be faulted for that.[27] Additionally, the United States is correct in its observation that use of the materials referred to by defendant in impeaching the testimony of witnesses against defendant would have served to "open the door" to damaging testimony about defendant on re-direct. Government's Response to Supplemental Motion for New Trial, at 14–15. Thus, Dickstein's decisions not to cross-examine witnesses with everything he had at his disposal can be seen as reasonable strategic choices that can not form the basis of a claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (noting that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

■■■ Defendant further faults Dickstein's cross-examination in that it "frequently illicited [sic]" "many negative non[-]tax related things ... about Tony Alamo." Supplemental Motion for New Trial, at 37. Defendant argues that this "doomed [defendant] to conviction from the beginning since it was Dickstein in opening [statement] that [sic] told the jury if they thought Alamo was nasty they would have to convict." *Id.* at 37–38. Specifically, defendant contends that his defense was prejudiced by Dickstein asking Cary Miller, a government witness, if they had met each other in "the child abuse case." *Id.* at 47. This question followed defendant's

---

**25.** In the Defendant's Reply to Government's Response to Motion for New Trial, at 11, defendant acknowledged that he had not offered any specific instances of ineffective assistance of counsel and stated that he "prefer[red] to make [them] at a later time."

**26.** The only witness as to whose cross-examination defendant makes an argument is Robert Miller, a "long[-]time opponent" of defendant about whom defendant had accumulated impeaching evidence. Supplemental Motion for a New Trial, at 52–53. Defendant contends that Dickstein's cross-examination was inadequate because it covered only one page of trial transcript, compared with forty-six pages for the di-

rect examination. Brevity of cross-examination does not necessarily suggest ineffectiveness. Rather, a brief cross-examination may, in certain circumstances, be highly effective. Defendant has made no showing that the cross-examination of Robert Miller was inadequate or that Dickstein chose not to ask specific questions that would have accomplished legitimate goals of cross-examination.

**27.** This alleged deficiency could not prejudice the defense. The end result—extrinsic evidence not being introduced—is the same whether Dickstein attempted to introduce the evidence and the Court excluded it or Dickstein never attempted to introduce it.

repeated explanation of the charges against him and his belief that they were meritless. Further, Dickstein asked Miller about his involvement in the child abuse case to reveal a bias against defendant. Thus, Dickstein's question was reasonable, and, under the circumstances, could not have prejudiced the defense.[28] Additionally, defendant contends that Dickstein invited a witness to refer to defendant as a polygamist. Supplemental Motion for New Trial, at 51–52. By asking Richard Hydel if he had "open hostility" towards defendant, Dickstein was pursuing the reasonable strategy of attempting to show bias. The fact that the phrasing of the question may not have been the most desirable does not mean that Dickstein committed an error "so serious that [he] was not functioning as the 'counsel' guaranteed by the Sixth Amendment" and "so serious as to deprive the defendant of a fair trial." *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

■ Defendant also argues that Dickstein's performance was deficient in that he allowed the introduction of prejudicial evidence about defendant. Defendant contends that Dickstein permitted introduction of information on defendant's religious beliefs and prosecution for child abuse despite the Court's pretrial order excluding such information. Supplemental Motion for New Trial, at 39–40. Specifically, defendant contends that Dickstein failed to move to redact defendant's tract, "The Heavenly Pharmacy," when it was introduced by the United States. *Id.*

at 40–47. The United States introduced the tract to show defendant's hostility towards the Internal Revenue Service and the United States government, but the tract also referred to the Cult Awareness Network and the California child abuse case.[29] After a heated argument outside of the presence of the jury,[30] the Court instructed the jury to disregard the references.[31] The failure of Dickstein to preemptively move to redact defendant's tract was an error, but it was not sufficiently serious or prejudicial to satisfy *Strickland*, 466 U.S. at 686–95, 104 S.Ct. at 2063–69.

■ Defendant also contends that Dickstein "left the jury with no choice but to dislike" defendant by introducing a document referring to the identification by *People* magazine and the *Nashville Banner* newspaper of defendant as "a deranged cult leader posing a danger to minor children." Supplemental Motion for New Trial, at 48. Dickstein introduced the document—an affidavit in support of a petition for custody of some of defendant's children filed by the children's mother's new husband—pursuant to the defense theory that "the action constituted an attack against the church and Pastor Alamo" and "the fees for the services paid by Music Square Church was [sic] a legitimate expense." *Id.* at 49–50. Thus, the introduction of the document was a reasonable choice "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citing *Michel v. Loui-*

28. Another example of conduct faulted by defendant being inconsequential is found in defendant's contention that Dickstein corroborated the prosecution's theory of the case that defendant owned and controlled the church business when Dickstein used the phrase "Pastor Alamo's businesses" in a question on cross-examination. Supplemental Motion for New Trial, at 51. A review of the transcript reveals that Dickstein argued against the prosecution theory of the case throughout the trial. The phrasing of a question for the sake of clarity could not overcome the effect of three weeks of argument to the contrary.

29. The tract accused the Internal Revenue Service and the Cult Awareness Network of conducting a "secret grand jury trial" against defendant, and claimed that the United States Government was coercing witnesses to testify against defendant on tax charges and in the "bogus child abuse case in Southern California." An expres-

sion of the defendant's belief that the Internal Revenue Service and others were conspiring against defendant was relevant to the prosecution and defense theories of the case, but the Court's interest in avoiding the potential prejudice of the use of the words "cult" and "child abuse" dictated redaction.

30. Dickstein's clash with the Court on this issue undermines defendant's argument—discussed *infra* part III.B.3.b.—that Dickstein tempered his defense of defendant to curry favor with the Court for his personal ends.

31. While testifying in his defense, defendant accused the attorney for the United States of conspiring with the Cult Awareness Network. Thus, defendant himself worked against the efforts of Dickstein and the Court to prevent the jury from hearing such references.

*siana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

 Defendant faults Dickstein for not moving to preclude the testimony of one witness regarding the relationship of the witness' sister with defendant, which defendant alleges to have been prejudicial in that it implied polygamy and an inter-racial sexual relationship. Supplemental Motion for New Trial, at 52. Dickstein objected to testimony of a relationship and the Court ruled that the United States could pursue this line of questioning. Nonetheless, defendant contends that Dickstein's performance was deficient with respect to this witness, contending that objecting at trial was not enough and Dickstein should have anticipated the testimony and filed a motion in limine. Dickstein can not be faulted because the Court permitted the introduction of this evidence despite Dickstein's efforts. Further, although Dickstein sought to exclude references to defendant as a polygamist, defendant's own testimony permitted the United States to inquire on the subject of polygamy on cross-examination. Thus, Dickstein's performance in this respect was not deficient, and the alleged deficiency could not be considered prejudicial.[32]

 Defendant also contends that the jury was "left with the erroneous perception that Defendant lived as a king and that church members provided slave labor for the various church businesses" because Dickstein chose not to read portions of the opinion in *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1988).[33] Supplemental Motion for New Trial, at 56. Defendant fails to cite which portions of that opinion would serve to refute this perception. In fact, the opinion reveals nothing whatsoever about the lifestyle of defendant or the employees of the church's businesses. Dickstein's performance can not be said to have been deficient in this respect. Likewise, defendant can establish no deficiency in Dickstein's performance by the mere contention without example that Dickstein limited his questions on direct examination of defendant. A review of the record indicates that Dickstein gave defendant an opportunity to offer testimony critical to his defense.

 Without any supporting evidence, defendant argues that Dickstein's performance was deficient in that "no meaningful plea negotiations could be entered and were never discussed." Supplemental Motion for New Trial, at 23; *see also* Defendant's Letter Brief, July 26, 1995, at 2, 3. This argument overlooks the facts of this case.[34] There is no indication that defendant was interested in pursuing plea negotiations. Dickstein testified at the July 14, 1995, evidentiary hearing that defendant had stated that he was unwilling to enter a guilty plea. Tr., Hr'g, July 14, 1995, at 31, 61–65. Further, a guilty plea would have been utterly inconsistent with defendant's trial strategy and demeanor.[35] The failure to pursue plea negotiations contrary to a client's wishes does not amount to deficient performance. Such failure, even if it were considered deficient, could not create a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69.

---

**32.** Defendant seems to be attempting to attack the Court's ruling through the guise of faulting Dickstein's performance. However, if the evidence that the Court allowed to be introduced was unfairly prejudicial, then the Court's ruling can be challenged directly rather than through the convoluted route of a claim of ineffective assistance of counsel.

**33.** In this case, the Supreme Court determined that church "associates" who work for the thirty-eight businesses run by the church are "employees" within the definition of the Fair Labor Standards Act and are entitled to the protections of the Act. 471 U.S. at 299–303, 306, 105 S.Ct. at 1960–63, 1964.

**34.** Defendant suggests that Dickstein should have pursued the possibility of the United States dismissing charges against defendant in exchange for defendant's testimony against Dickstein. Defendant's Letter Brief, July 26, 1995, at 2. There is no support for the proposition—and it is unbelievable—that the United States would have been willing to cut a deal with defendant to pursue criminal charges against Dickstein.

**35.** Defendant spoke against the Internal Revenue Service and denied his guilt before the trial, during the trial, and during his sentencing hearing.

Defendant contends that Dickstein was derelict in his duty because he did not make a motion under Fed.R.Crim.P. 29 for judgment of acquittal after the close of evidence. Supplemental Motion for New Trial, at 50–51. Such a motion would surely not have been granted and counsel has no obligation to make motions just for the sake of making motions. *See Krist v. Foltz*, 804 F.2d 944, 946 (6th Cir.1986). Defendant argues that Dickstein's performance in this case was deficient because defendant was convicted and Dickstein had previously represented defendant in another case that resulted in an acquittal. *See* Defendant's Reply to Government's Response to Supplemental Motion for New Trial, at 4. The Sixth Amendment does not provide criminal defendants with an insurance policy against conviction. Failing to offer the specific instances of deficient performance required by *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir.1987), defendant can not demonstrate a Sixth Amendment violation on the fact of conviction alone. As this case indicates, counsel can be constitutionally effective in that the trial can "be relied on as having produced a just result," *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064, even when that result is conviction.

### b. *Actual Conflict of Interest Adversely Affecting Performance*

When "an actual conflict of interest adversely affected his lawyer's performance," a criminal defendant is entitled to a presumption of prejudice in the context of a claim of ineffective assistance of counsel. *Strickland,*

466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)). Defendant argues that the potential conflicts identified by the United States before trial— and so vigorously disputed by defendant at that time—blossomed into actual conflicts that adversely affected Dickstein's performance. However, defendant fails to show that Dickstein "actually represented conflicting interests" and that any such actual conflict adversely affected Dickstein's representation of defendant.[36] *See id.*

Defendant's first contention is that the existence of Sanford White, a potential witness who did not testify but allegedly had been represented by Dickstein "in a separate action arising out of the same set of facts as were at issue here," created an actual conflict in that Dickstein's "preparation" for trial was hampered. Motion for New Trial, at 13. This was merely a potential conflict.[37] Although the case defendant cites, *Simmons v. Lockhart,* 856 F.2d 1144, 1146 (8th Cir.1988), notes that an actual conflict that prevents defense counsel from vigorously cross-examining a witness for the prosecution will violate defendant's Sixth Amendment rights, it is clear that the witness must testify for there to be an actual conflict. Alternatively, defendant contends that it "is conceivable that [White] should have been called in Alamo's defense." Supplemental Motion for New Trial, at 16; *see also* Defendant's Reply to Government's Response to Supplemental Motion for New Trial, at 7.[38]

**36.** Defendant attempts to bypass the correct inquiry by contending that defendant's right to conflict-free representation was violated because professional ethics dictated that Dickstein should have withdrawn as counsel for defendant. Motion for New Trial, at 18–21 (citing Model Code of Professional Responsibility DR 5–101 & DR 5–105(b)). However, reference to professional ethics is not definitive in this context. *See Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065 ("Prevailing norms of practice . . . are only guides"). A criminal defendant's rights are not violated every time counsel violates a rule of professional conduct. Unethical conduct by an attorney may actually be for the benefit of or at the behest of the client. Thus, whether professional ethics dictate that Dickstein should have withdrawn from representing defendant because of potential conflicts is not material to a determination of wheth-

er Dickstein served as the counsel whose assistance is guaranteed by the Sixth Amendment.

**37.** Defendant had previously denied that Dickstein ever represented Sanford White. Defendant and Dickstein's Opposition to Government's Motion for Hearing to Record Defendant's Waiver of Right to Conflict–Free Representation, January 24, 1994, at 2. Defendant has not since offered any proof that Dickstein actually represented White, or that such representation would have created duties on the part of Dickstein that would interfere with examining White on behalf of defendant.

**38.** Defendant contends that White had "information which might have contradicted the testimony of Elizabeth Caldwell," one of defendant's

The decision to call a witness is a matter of strategy, on which counsel is entitled to substantial deference. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065–66. Dickstein's judgment that the drawbacks of White's testimony outweighed the potential advantages can not form the basis of a claim for ineffective assistance of counsel.

■ Defendant's second contention is that the possible prosecution of Dickstein for failure to file income tax returns and currency transaction reports and for conspiracy to commit bankruptcy fraud (along with defendant) created an actual conflict between Dickstein's self-interest and Dickstein's representation of defendant. Motion for New Trial, at 17–18; Supplemental Motion for New Trial, at 14–15. There is no proof that Dickstein had been indicted or arrested for any criminal charges.[39] Moreover, defendant offers no proof that there was an on-going criminal investigation relating to these potential charges against Dickstein. Without such proof, it can not be said that an actual conflict of interest existed.[40] Further, defendant fails to show that the alleged actual conflict of interest adversely affected Dickstein's per-

formance. Defendant argues that Dickstein's performance was adversely affected in that he failed to pursue the possibility of cutting a deal for defendant that would have entailed defendant testifying against Dickstein in some subsequent prosecution of Dickstein. Motion for New Trial, at 14–15. There is no adverse affect because there was no chance for such a deal for defendant. *See* discussion *supra* note 34 and accompanying text. Defendant also argues that "[i]t goes without saying that Dickstein had an interest in tempering his defense of Alamo in order to curry favor with the prosecution, perhaps fearing that a spirited defense of Alamo would prompt the Government to pursue the case against Dickstein with greater vigor."[41] Supplemental Motion for New Trial, at 26. In support of this proposition, defendant contends that Dickstein's "failure to call certain witnesses or question Government witnesses may have resulted from his personal desire to refrain from inquiring at the Defendant's trial into certain matters that were directly relevant to, and potentially exculpatory[ ] of[,] his client." Supplemental Motion for New trial, at 27. Defendant offers no specif-

former wives who testified against him at trial. Defendant's Reply to Government's Response to Supplemental Motion for New Trial, at 7.

**39.** In fact, Dickstein testified at the July 14, 1995, evidentiary hearing, that he did not believe that he would be prosecuted. Tr, Hr'g, July 14, 1995, at 68. If Dickstein did not believe he would be prosecuted, then his performance could not be limited by an effort to curry favor with the potential prosecutors. *See, e.g., United States v. Hopkins,* 43 F.3d 1116, 1119 (6th Cir.) (holding a conflict of interest is not actual unless counsel is aware of it), *cert. denied,* — U.S. ——, 115 S.Ct. 2017, 131 L.Ed.2d 1015 (1995).

Defendant also contends that the fact that Defendant's Reply to Addendum to Government Motion to Disqualify, July 26, 1993, at 3, included a motion for a Court order preventing the use of information from the bankruptcy hearing in any civil or criminal proceeding against Dickstein evidences the divergence of the interests of Dickstein and defendant. Motion for New Trial, at 8–9. However, this motion was not inconsistent with the interests of defendant.

**40.** The cases cited by defendant in favor of the proposition that Dickstein was burdened by an actual conflict of interest—all of which are not from the Sixth Circuit and, thus, not controlling—are distinguishable. *United States v.*

*McLain,* 823 F.2d 1457, 1463–64 (11th Cir.1987), found an actual conflict of interest existed where defense counsel was aware that he was being actively investigated by the same office that was prosecuting his client, and where defense counsel and prosecutors agreed to wait to file the indictment until after the trial of defense counsel's client. *Mannhalt v. Reed,* 847 F.2d 576, 580–81 (9th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988), found an actual conflict existed where in open court a prosecution witness accused defense counsel of receiving stolen property from the defendant. *United States v. Fulton,* 5 F.3d 605, 609–10 (2d Cir.1993), found that an actual conflict existed where a co-conspirator had previously implicated defense counsel in the conspiracy for which defendant was on trial and defense counsel was under investigation. *United States v. Levy,* 25 F.3d 146 (2d Cir.1994), found an actual conflict existed where counsel had implicated defendant in plea negotiations for a co-conspirator whom he represented, was being investigated for criminal charges related to the flight of the co-conspirator, and was being prosecuted on unrelated charges by the same office prosecuting defendant.

**41.** Dickstein denies tempering his defense to curry favor with the Internal Revenue Service or the Department of Justice. Tr., Hr'g, July 14, 1995, at 34.

ic examples where Dickstein's performance was restrained in the manner defendant suggests. Rather, a review of the record indicates that Dickstein was hostile to the prosecution, regularly clashing with prosecution attorneys and seeking to impeach and impugn prosecution witnesses.

██ Defendant's third contention is that the pendency of an April 1994 disbarment hearing in California for Dickstein "created a conflict between Dickstein's self[-]interest in retaining his law license and his obligation to represent Defendant zealously." Supplemental Motion for New Trial, at 20. Defendant contends that the "propriety of [Dickstein's] performance, pretrial and during the trial, becomes suspect based on" the fact that Dickstein "sought to please the Court (and ultimately the State Bar of California)." [42] *Id.* at 20–21. This argument is flawed for several reasons. First, the record does not support the contention that Dickstein did anything to please the Court. Second, there is no reason that a counsel's efforts to please the Court by displaying ethical behavior and a proper understanding of rules would be necessarily contrary to a client's legitimate interests.[43] Third, even if Dickstein had sought to ingratiate himself with the Court prior to an April 1994 hearing, there is no reason to suspect that Dickstein's performance at the trial in May–June 1994 would have suffered. Clearly, disciplinary proceedings against Dickstein created no actual conflict of interest that adversely affected his performance.

## IV. *Conclusion*

Defendant's motion for a new trial and/or judgment of acquittal is hereby DENIED. The motion for judgment of acquittal is not timely under Fed.R.Crim.P. 29, nor does defendant make a showing that the evidence considered at trial was insufficient to sustain a conviction. Further, even if defendant's statute of limitations argument could be considered in this context, it is clear that the argument lacks any merit. The motion for new trial under Fed.R.Crim.P. 29(c) is not timely since it is not based on newly discovered evidence. On the merits, the ineffective assistance of counsel argument fails on two separate ground. First, defendant waived the right to conflict-free representation at the February 23, 1994, waiver hearing. Second, there was no ineffective assistance of counsel rendered to defendant by Dickstein in this case. Dickstein's performance was not deficient and none of his alleged deficiencies prejudiced the defense. Further, defendant is not entitled to a presumption of prejudice since there is no showing that any potential conflict of interest ripened into an actual conflict of interest that adversely affected Dickstein's performance at trial.

SO ORDERED.

██

---

42. At a November 29, 1993, telephone conference, Dickstein, in a clearly humorous tone, suggested that the Court might write a letter of commendation on his behalf to the California State Bar. At the February 23, 1994, waiver hearing, the Court stated it had considered Dickstein's request to be a "joke." Tr., Hr'g, February 23, 1994, at 5.

43. Counsel always has a duty to behave in a manner consistent with the rules of professional responsibility. One of the fundamental duties of an attorney is that of zealous representation of his client. Thus, any effort to sacrifice a client's interests in favor of self-interest would be unethical.